## UNITED STATES *v.* BASS

No. 70–71.   Argued October 18, 1971—Decided December 20, 1971

*Roger A. Pauley* argued the cause for the United States.   With him on the brief were *Solicitor General Griswold, Assistant Attorney General Wilson, Samuel Huntington,* and *Beatrice Rosenberg.*

*William E. Hellerstein,* by appointment of the Court, 402 U. S. 927, argued the cause for respondent. With him on the brief was *Phylis Skloot Bamberger.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Respondent was convicted in the Southern District of New York of possessing firearms in violation of Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U. S. C. App. § 1202 (a). In pertinent part, that statute reads:

> "Any person who—
> "(1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony . . . and who receives, possesses, or transports in commerce or affecting commerce . . . any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both." [1]

The evidence showed that respondent, who had previously been convicted of a felony in New York State, possessed

---

[1] Section 1202 (a) reads in full:

"Any person who—

"(1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony, or

"(2) has been discharged from the Armed Forces under dishonorable conditions, or

"(3) has been adjudged by a court of the United States or of a State or any political subdivision thereof of being mentally incompetent, or

"(4) having been a citizen of the United States has renounced his citizenship, or

"(5) being an alien is illegally or unlawfully in the United States, and who receives, possesses, or transports in commerce or affecting commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both."

on separate occasions a pistol and then a shotgun. There was no allegation in the indictment and no attempt by the prosecution to show that either firearm had been possessed "in commerce or affecting commerce." The Government proceeded on the assumption that § 1202 (a)(1) banned all possessions and receipts of firearms by convicted felons, and that no connection with interstate commerce had to be demonstrated in individual cases.

After his conviction,[2] respondent unsuccessfully moved for arrest of judgment on two primary grounds: that the statute did not reach possession of a firearm not shown to have been "in commerce or affecting commerce," and that, if it did, Congress had overstepped its constitutional powers under the Commerce Clause. 308 F. Supp. 1385. The Court of Appeals reversed the conviction, being of the view that if the Government's construction of the statute were accepted, there would be substantial doubt about the statute's constitutionality. 434 F. 2d 1296. We granted certiorari to resolve a conflict among lower courts over the proper reach of the statute.[3] We affirm the judgment of the court below,

[2] Respondent was acquitted on another count charging him with carrying a firearm during the commission of a felony (the sale of a narcotic drug), a federal offense under 18 U. S. C. § 924 (c)(2).

[3] At this date, six circuits and numerous district courts have decided the issue. The Government's view was adopted in *United States* v. *Cabbler*, 429 F. 2d 577 (CA4 1970), cert. denied, 400 U. S. 901; *United States* v. *Donofrio*, 450 F. 2d 1054 (CA5 1971); *Stevens* v. *United States*, 440 F. 2d 144 (CA6 1971) (one judge dissenting); *United States* v. *Synnes*, 438 F. 2d 764 (CA8 1971); *United States* v. *Daniels*, 431 F. 2d 697 (CA9 1970). The result reached by the Second Circuit in this case has also been reached in *United States* v. *Harbin*, 313 F. Supp. 50 (ND Ind. 1970); *United States* v. *Steed*, No. CR 70–57 (WD Tenn., May 11, 1970); *United States* v. *Phelps*, No. CR 14,465 (MD Tenn., Feb. 10, 1970); *United States* v. *Francis*, No. CR 12,684 (ED Tenn., Dec. 12, 1969).

but for substantially different reasons.[4] We conclude that § 1202 is ambiguous in the critical respect. Because its sanctions are criminal and because, under the Government's broader reading, the statute would mark a major inroad into a domain traditionally left to the States, we refuse to adopt the broad reading in the absence of a clearer direction from Congress.

## I

Not wishing "to give point to the quip that only when legislative history is doubtful do you go to the statute,"[5] we begin by looking to the text itself. The critical textual question is whether the statutory phrase "in commerce or affecting commerce" applies to "possesses" and "receives" as well as to "transports." If it does, then the Government must prove as an essential element of the offense that a possession, receipt, or transportation was "in commerce or affecting commerce"—a burden not undertaken in this prosecution for possession.

While the statute does not read well under either view, "the natural construction of the language" suggests that the clause "in commerce or affecting commerce" qualifies all three antecedents in the list. *Porto Rico Railway, Light & Power Co.* v. *Mor,* 253 U. S. 345, 348 (1920). Since "in commerce or affecting commerce" undeniably

---

[4] In light of our disposition of the case, we do not reach the question whether, upon appropriate findings, Congress can constitutionally punish the "mere possession" of firearms; thus, we need not consider the relevance, in that connection, of our recent decision in *Perez* v. *United States,* 402 U. S. 146 (1971). The question whether the definition of "felony" in § 1202 (c) (2) creates a classification violating the Fifth Amendment was not raised in the Government's Petition for Certiorari, and is also not considered here.

[5] Frankfurter, Some Reflections on the Reading of Statutes, 47 Col. L. Rev. 527, 543 (1947).

applies to at least one antecedent, and since it makes sense with all three, the more plausible construction here is that it in fact applies to all three. But although this is a beginning, the argument is certainly neither overwhelming nor decisive.[6]

In a more significant respect, however, the language of the statute does provide support for respondent's reading. Undeniably, the phrase "in commerce or affecting commerce" is part of the "transports" offense. But if that phrase applies *only* to "transports," the statute would have a curious reach. While permitting transportation of a firearm unless it is transported "in commerce or affecting commerce," the statute would prohibit all possessions of firearms, and both interstate and intrastate receipts. Since virtually all transportations, whether interstate or intrastate, involve an accompanying possession or receipt, it is odd indeed to argue that on the one hand the statute reaches all possessions and

---

[6] Compare *United States* v. *Standard Brewery, Inc.*, 251 U. S. 210, 218 (1920), with *FTC* v. *Mandel Brothers, Inc.*, 359 U. S. 385, 389–390 (1959); see also 2 J. Sutherland, Statutory Construction § 4921 (3d ed. 1943); K. Llewellyn, The Common Law Tradition 527 (1960).

The Government, noting that there is no comma after "transports," argues that the punctuation indicates a congressional intent to limit the qualifying phrase to the last antecedent. But many leading grammarians, while sometimes noting that commas at the end of series can avoid ambiguity, concede that use of such commas is discretionary. See, *e. g.*, B. Evans & C. Evans, A Dictionary of Contemporary American Usage 103 (1957); M. Nicholson, A Dictionary of American-English Usage 94 (1957); R. Copperud, A Dictionary of Usage and Style 94–95 (1964); cf. W. Strunk & E. White, The Elements of Style 1–2 (1959). When grammarians are divided, and surely where they are cheerfully tolerant, we will not attach significance to an omitted comma. It is enough to say that the statute's punctuation is fully consistent with the respondent's interpretation, and that in this case grammatical expertise will not help to clarify the statute's meaning.

receipts, and on the other hand outlaws only interstate transportations. Even assuming that a person can "transport" a firearm under the statute without possessing or receiving it, there is no reason consistent with any discernible purpose of the statute to apply an interstate commerce requirement to the "transports" offense alone.[7] In short, the Government has no convincing explanation for the inclusion of the clause "in commerce or affecting commerce" if that phrase only applies to the word "transports." It is far more likely that the phrase was meant to apply to "possesses" and "receives" as well as "transports." As the court below noted, the inclusion of such a phrase "mirror[s] the approach to federal criminal jurisdiction reflected in many other federal statutes."[8]

Nevertheless, the Government argues that its reading is to be preferred because the defendant's narrower interpretation would make Title VII redundant with Title IV of the same Act. Title IV, *inter alia,* makes it a

---

[7] The Government urges that "transports" includes the act of "causing a firearm to be transported," and therefore would connote an offense separate in some cases from "receives" or "possesses." From this, the Government argues that "Congress might have felt that the broader scope of the term 'transports,' as compared to the terms 'receives' or 'possesses,' justified its qualification by the interstate commerce requirement." Brief for the United States 14–15. The Government's view about the comparative breadth of the various offenses certainly does not follow from its definition of "transports." But beyond that, its argument about what Congress "might have felt" is purely speculative, and finds no support in any arguable purpose of the statute. There is certainly no basis for concluding that Congress was less concerned about the transporting and supplying of guns than their acquisition.

[8] 434 F. 2d, at 1298. See, *e. g.,* 18 U. S. C. § 2421 (prostitution); 18 U. S. C. § 1952 (Travel Act); 18 U. S. C. § 1951 (robbery and extortion); 18 U. S. C. § 1231 (strikebreaking); 18 U. S. C. § 1201 (kidnaping); 18 U. S. C. § 1084 (gambling); 18 U. S. C. § 842 (i) (explosives); 15 U. S. C. § 1 *et seq.* (antitrust); 15 U. S. C. § 77e (securities fraud).

crime for four categories of people—including those convicted of a crime punishable for a term exceeding one year—"to ship or transport any firearm or ammunition in interstate or foreign commerce . . . [or] to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U. S. C. §§ 922 (g) and (h). As Senator Long, the sponsor of Title VII, represented to Senator Dodd, the sponsor of Title IV, Title VII indeed does complement Title IV. 114 Cong. Rec. 14774; see also 114 Cong. Rec. 16286. Respondent's reading of Title VII is fully consistent with this view. First, although subsections of the two Titles do address their prohibitions to some of the same people, each statute also reaches substantial groups of people not reached by the other.[9] Secondly, Title VII complements Title IV by punishing a broader class of behavior. Even under respondent's view, a Title VII offense is made out if the firearm was possessed or received "in commerce or affecting commerce"; however, Title IV apparently does not reach possessions or intrastate transactions at all, even those with an interstate commerce nexus, but is

---

[9] Title VII limits the firearm-related activity of convicted felons, dishonorable dischargees from the Armed Services, persons adjudged "mentally incompetent," aliens illegally in the country, and former citizens who have renounced their citizenship. See n. 1, *supra*. A felony is defined as "any offense punishable by imprisonment for a term exceeding one year, but does not include any offense (other than one involving a firearm or explosive) classified as a misdemeanor under the laws of a State and punishable by a term of imprisonment of two years or less . . . ." 18 U. S. C. App. § 1202 (c) (2).

Title IV reaches persons "under indictment for, or . . . convicted in any court of, a crime punishable by imprisonment for a term exceeding one year"; fugitives from justice; users or addicts of various drugs; persons adjudicated as "mental defective[s] or . . . committed" to a mental institution. 18 U. S. C. §§ 922 (g) and (h).

limited to the sending or receiving of firearms as part of an interstate transportation.[10]

In addition, whatever reading is adopted, Title VII and Title IV are, in part, redundant. The interstate commerce requirement in Title VII minimally applies to transportation. Since Title IV also prohibits convicted criminals from transporting firearms in interstate commerce, the two Titles overlap under both readings. The Government's broader reading of Title VII does not eliminate the redundancy, but simply creates a larger area in which there is no overlap. While the Government would be on stronger ground if its reading were necessary to give Title VII some unique and independent thrust, this is not the case here. In any event, circumstances surrounding the passage of Title VII make plain that Title VII was not carefully molded to complement Title

---

[10] Title IV, 18 U. S. C. §§ 922 (g) and (h), is a modified and recodified version of 15 U. S. C. §§ 902 (e) and (f) (1964 ed.), 75 Stat. 757, which in turn amended the original statute passed in 1938, 52 Stat. 1250, 1251. Each amendment enlarged the group of people coming within the Act's substantive prohibitions against transportation or receipt of firearms in interstate commerce. The wording of the substantive offense has remained identical, although the original Act had a provision that possession of a firearm "shall be presumptive evidence that such firearm or ammunition was shipped or transported or received [in interstate or foreign commerce]." That presumption was struck down in *Tot* v. *United States*, 319 U. S. 463 (1943), and the Court there noted:

"[T]he Act is confined to the receipt of firearms or ammunition as a part of interstate transportation and does not extend to the receipt, in an intrastate transaction, of such articles which, at some prior time, have been transported interstate." *Id.*, at 466.

While the reach of Title IV itself is a question to be decided finally some other day, the Government has presented here no learning or other evidence indicating that the 1968 Act changed the prior approach to the "receipt" offense. See, *e. g.*, S. Rep. No. 1097, 90th Cong., 2d Sess., 115 (1968).

IV.  Title VII was a last-minute Senate amendment to the Omnibus Crime Control and Safe Streets Act.  The Amendment was hastily passed, with little discussion, no hearings, and no report.[11]  The notion that it was enacted to dovetail neatly with Title IV rests perhaps on a conception of the model legislative process; but we cannot pretend that all statutes are model statutes.  While courts should interpret a statute with an eye to the surrounding statutory landscape and an ear for harmonizing potentially discordant provisions, these guiding principles are not substitutes for congressional lawmaking.  In our view, no conclusion can be drawn from Title IV concerning the correct interpretation of Title VII.

---

[11] The Omnibus Crime Control and Safe Streets Act of 1968 started its life as a measure designed to aid state and local governments in law enforcement by means of financial and administrative assistance.  See H. R. Rep. No. 488, 90th Cong., 1st Sess. (1967).  The bill passed the House on August 8, 1967, and went to the Senate.  A similar bill was introduced in the Senate (S. 917) and went to the Committee on the Judiciary, which rewrote it completely.  See S. Rep. No. 1097, 90th Cong., 2d Sess., *supra.*  The amendments included the much-debated provisions regarding the admissibility of confessions, wiretapping, and state firearms control.

On May 17, 1968, Senator Long introduced on the floor his amendment to S. 917, which he designated Title VII.  His introductory remarks set forth the purpose of the amendment.  114 Cong. Rec. 13867–13869.  About a week later he explained his amendment once again.  There was a brief debate; the reaction was favorable but cautious, with "further thought" and "study" being suggested by several favorably inclined Senators who observed some problems with the bill as drafted.  Unexpectedly, however, there was a call for a vote and Title VII passed without modification.  See 114 Cong. Rec. 14772–14775.  The amendment received only passing mention in the House discussion of the bill, 114 Cong. Rec. 16286, 16298, and never received committee consideration or study in the House either.

Other aspects of the meager legislative history, however, do provide some significant support for the Government's interpretation. On the Senate floor, Senator Long, who introduced § 1202, described various evils that prompted his statute. These evils included assassinations of public figures and threats to the operation of businesses significant enough in the aggregate to affect commerce.[12] Such evils, we note, would be most thoroughly mitigated by forbidding every possession of any firearm by specified classes of especially risky people, regardless of whether the gun was possessed, received, or transported "in commerce or affecting commerce." In addition, specific remarks of the Senator can be read to state that the amendment reaches the mere possession of guns without any showing of an interstate commerce nexus.[13] But Senator Long never specifically says that no connection with commerce need be shown in the individual case. And nothing in his statements explains why, if an interstate commerce nexus is irrelevant in individual cases, the phrase "in commerce or affecting commerce" is in the statute at all.[14] But even if Senator

---

[12] See 114 Cong. Rec. 13868–13871, 14772–14775.

[13] For example, Senator Long began his floor statement by announcing:

"I have prepared an amendment which I will offer at an appropriate time, simply setting forth the fact that anybody who has been convicted of a felony [or comes within certain other categories] . . . is not permitted to possess a firearm . . . ." 114 Cong. Rec. 13868.

[14] For the same, and additional, reasons, § 1201, which contains the congressional "findings" applicable to § 1202 (a), is not decisive support for the Government. That section reports that:

"The Congress hereby finds and declares that the receipt, possession, or transportation of a firearm by felons, veterans who are discharged under dishonorable conditions, mental incompetents,

Long's remarks were crystal clear to us, they were apparently not crystal clear to his congressional colleagues. Meager as the discussion of Title VII was, one of the few Congressmen who discussed the amendment summarized Title VII as "mak[ing] it a Federal crime to take, possess, or receive a firearm across State lines . . . ." 114 Cong. Rec. 16298 (statement of Rep. Pollock).

In short, "the legislative history of [the] Act hardly speaks with that clarity of purpose which Congress supposedly furnishes courts in order to enable them to enforce its true will." *Universal Camera Corp.* v. *NLRB*, 340 U. S. 474, 483 (1951). Here, as in other cases, the various remarks by legislators "are sufficiently ambiguous insofar as this narrow issue is concerned . . . to invite mutually destructive dialectic," and not much more.

---

aliens who are illegally in the country, and former citizens who have renounced their citizenship, constitutes—

"(1) a burden on commerce or threat affecting the free flow of commerce,

"(2) a threat to the safety of the President of the United States and Vice President of the United States,

"(3) an impediment or a threat to the exercise of free speech and the free exercise of a religion guaranteed by the first amendment to the Constitution of the United States, and

"(4) a threat to the continued and effective operation of the Government of the United States and of the government of each State guaranteed by article IV. of the Constitution."

The Government argues that these findings would have been "wholly unnecessary" unless Congress intended to prohibit all receipts and possessions of firearms by felons. But these findings of "burdens" and "threats" simply state Congress' view of the constitutional basis for its power to act; the findings do not tell us how much of Congress' perceived power was in fact invoked. That the findings in fact support a statute broader than the one actually passed is suggested by the fact that "in commerce or affecting commerce" does not appear at all in the introductory clause to the "findings," even though § 1202 (a) contains the phrase and concededly reaches only transportation "in commerce or affecting commerce."

*FCC* v. *Columbia Broadcasting System,* 311 U. S. 132, 136 (1940). Taken together, the statutory materials are inconclusive on the central issue of whether or not the statutory phrase "in commerce or affecting commerce" applies to "possesses" and "receives" as well as "transports." While standing alone, the legislative history might tip in the Government's favor, the respondent explains far better the presence of critical language in the statute. The Government concedes that "the statute is not a model of logic or clarity." Pet. for Cert. 5. After "seiz[ing] every thing from which aid can be derived," *United States* v. *Fisher,* 2 Cranch 358, 386 (1805) (Marshall, C. J.), we are left with an ambiguous statute.

## II

Given this ambiguity, we adopt the narrower reading: the phrase "in commerce or affecting commerce" is part of all three offenses, and the present conviction must be set aside because the Government has failed to show the requisite nexus with interstate commerce. This result is dictated by two wise principles this Court has long followed.

First, as we have recently reaffirmed, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis* v. *United States,* 401 U. S. 808, 812 (1971). See also *Ladner* v. *United States,* 358 U. S. 169, 177 (1958); *Bell* v. *United States,* 349 U. S. 81 (1955); *United States* v. *Five Gambling Devices,* 346 U. S. 441 (1953) (plurality opinion for affirmance). In various ways over the years, we have stated that "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States* v. *Universal C. I. T. Credit Corp.,*

344 U. S. 218, 221–222 (1952). This principle is founded on two policies that have long been part of our tradition. First, "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." *McBoyle* v. *United States,* 283 U. S. 25, 27 (1931) (Holmes, J.).[15] See also *United States* v. *Cardiff,* 344 U. S. 174 (1952). Second, because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." H. Friendly, Mr. Justice Frankfurter and the Reading of Statutes, in Benchmarks 196, 209 (1967). Thus, where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant. Here, we conclude that Congress has not "plainly and unmistakably," *United States* v. *Gradwell,* 243 U. S. 476, 485 (1917), made it a federal crime for

---

[15] Holmes prefaced his much-quoted statement with the observation that "it is not likely that a criminal will carefully consider the text of the law before he murders or steals . . . ." But in the case of gun acquisition and possession it is not unreasonable to imagine a citizen attempting to "[steer] a careful course between violation of the statute [and lawful conduct]," *United States* v. *Hood,* 343 U. S. 148, 151 (1952). Of course, where there is a state law prohibiting felons from possessing firearms, as in New York State, N. Y. Penal Law § 265.05 (Supp. 1971–1972), it may be unreal to argue that there are notice problems under the federal law. There are many States, however, that do not have their own laws prohibiting felons from possessing firearms. See Geisel, Roll, & Wettick, The Effectiveness of State and Local Regulation of Handguns: A Statistical Analysis, 1969 Duke L. J. 647, 652–653. Since ex-offenders in these States are limited only by the federal gun control laws, the notice problem of that law may be quite real.

a convicted felon simply to possess a gun absent some demonstrated nexus with interstate commerce.

There is a second principle supporting today's result: unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance.[16] Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States.[17] This congressional policy is rooted in the same concepts of American federalism that have provided the basis for judge-made doctrines. See, *e. g., Younger* v. *Harris,* 401 U. S. 37 (1971). As this Court emphasized only last Term in *Rewis* v. *United States, supra,* we will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction. In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision. In *Rewis,* we declined to accept an expansive interpretation of the Travel Act. To do so, we said then, "would alter sensitive federal-state relationships [and] could over-extend limited federal police resources." While we noted there that "[i]t is not for us to weigh the merits of these factors," we went on to conclude that "the fact

---

[16] *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 513 (1940); *United States* v. *Five Gambling Devices,* 346 U. S. 441, 449-450 (1953) (plurality opinion); *FTC* v. *Bunte Bros., Inc.,* 312 U. S. 349, 351, 354-355 (1941); Frankfurter, Some Reflections on the Reading of Statutes, 47 Col. L. Rev. 527, 539-540 (1947). Cf. *Auto Workers* v. *Wisconsin Board,* 351 U. S. 266, 274-275 (1956); *Palmer* v. *Massachusetts,* 308 U. S. 79, 83-84 (1939); *Leiter Minerals, Inc.* v. *United States,* 352 U. S. 220, 225-226 (1957).

[17] H. Hart & A. Sacks, The Legal Process: Basic Problems in the Making and Application of Law 1241 (tent. ed. 1958).

that they are not even discussed in the legislative history . . . strongly suggests that Congress did not intend that [the statute have the broad reach]." 401 U. S., at 812. In the instant case, the broad construction urged by the Government renders traditionally local criminal conduct a matter for federal enforcement and would also involve a substantial extension of federal police resources. Absent proof of some interstate commerce nexus in each case, § 1202 (a) dramatically intrudes upon traditional state criminal jurisdiction. As in *Rewis,* the legislative history provides scanty basis for concluding that Congress faced these serious questions and meant to affect the federal-state balance in the way now claimed by the Government. Absent a clearer statement of intention from Congress than is present here, we do not interpret § 1202 (a) to reach the "mere possession" of firearms.

### III

Having concluded that the commerce requirement in § 1202 (a) must be read as part of the "possesses" and "receives" offenses, we add a final word about the nexus with interstate commerce that must be shown in individual cases. The Government can obviously meet its burden in a variety of ways. We note only some of these. For example, a person "possesses . . . in commerce or affecting commerce" if at the time of the offense the gun was moving interstate or on an interstate facility, or if the possession affects commerce. Significantly broader in reach, however, is the offense of "receiv[ing] . . . in commerce or affecting commerce," for we conclude that the Government meets its burden here if it demonstrates that the firearm received has previously traveled in interstate commerce.[18] This is

---

[18] This reading preserves a significant difference between the "receipt" offenses under Title IV and Title VII. See *supra,* at 342–343.

not the narrowest possible reading of the statute, but canons of clear statement and strict construction do "not mean that every criminal statute must be given the narrowest possible meaning in complete disregard of the purpose of the legislature." *United States* v. *Bramblett,* 348 U. S. 503, 510 (1955). We have resolved the basic uncertainty about the statute in favor of the narrow reading, concluding that "in commerce or affecting commerce" is part of the offense of possessing or receiving a firearm. But, given the evils that prompted the statute and the basic legislative purpose of restricting the firearm-related activity of convicted felons, the readings we give to the commerce requirement, although not all narrow, are appropriate. And consistent with our regard for the sensitive relation between federal and state criminal jurisdiction, our reading preserves as an element of all the offenses a requirement suited to federal criminal jurisdiction alone.

The judgment is

*Affirmed.*

MR. JUSTICE BRENNAN joins the judgment of the Court and the opinion except for Part III. No question of the quantum of evidence necessary to establish the Government's prima facie case is before the Court and he would await a case properly presenting that question before deciding it.

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE joins, dissenting.

I cannot join the Court's opinion and judgment. Five of the six United States courts of appeals that have passed upon the issue presented by this case have decided it adversely to the position urged by the respondent here. *United States* v. *Cabbler,* 429 F. 2d 577 (CA4 1970), cert. denied, 400 U. S. 901; *United States* v. *Mullins,*

432 F. 2d 1003 (CA4 1970); *United States* v. *Donofrio,* 450 F. 2d 1054 (CA5 1971); *Stevens* v. *United States,* 440 F. 2d 144 (CA6 1971) (one judge dissenting); *United States* v. *Synnes,* 438 F. 2d 764 (CA8 1971); *United States* v. *Wiley,* 438 F. 2d 773 (CA8 1971); *United States* v. *Taylor,* 438 F. 2d 774 (CA8 1971); *United States* v. *Daniels,* 431 F. 2d 697 (CA9 1970); *United States* v. *Crow,* 439 F. 2d 1193 (CA9 1971). Only the Second Circuit stands opposed.[1]

1. The statute, 18 U. S. C. App. § 1202 (a), when it speaks of one "who receives, possesses, or transports in commerce or affecting commerce," although arguably ambiguous and, as the Government concedes, "not a model of logic or clarity," [2] is clear enough. The structure of the vital language and its punctuation make it refer to one who receives, to one who possesses, and to one who transports in commerce. If one wished to say that he would welcome a cat, would welcome a dog, or would welcome a cow that jumps over the moon, he would likely say "I would like to have a cat, a dog, or a cow that jumps over the moon." So it is here.

2. The meaning the Court implants on the statute is justified only by the addition and interposition of a comma after the word "transports." I perceive no warrant for this judicial transfiguration.

---

[1] Unappealed district court decisions are in conflict. Those upholding the Government's position include *United States* v. *Davis,* 314 F. Supp. 1161 (ND Miss. 1970); *United States* v. *Vicary,* No. CR 44,205 (ED Mich., June 29, 1970) (*en banc*); *United States* v. *Childress,* No. 8039–R (ED Va., Jan. 6, 1969); *United States* v. *Boggs,* No. 8138 (Wyo., June 17, 1970). Those opposed include *United States* v. *Harbin,* 313 F. Supp. 50 (ND Ind. 1970); *United States* v. *Steed,* No. CR 70–57 (WD Tenn., May 11, 1970); *United States* v. *Phelps,* No. CR 14,465 (MD Tenn., Feb. 10, 1970); *United States* v. *Francis,* No. CR 12,684 (ED Tenn., Dec. 12, 1969).

[2] Pet. for Cert. 5.

3. In the very same statute the phrase "after the date of enactment of this Act" is separated by commas and undeniably modifies each of the preceding words, "receives," "possesses," and "transports." Obviously, then, the draftsman—and the Congress—knew the use of commas for phrase modification. We should give effect to the only meaning attendant upon that use.

4. The specific finding in 18 U. S. C. App. § 1201 [3] clearly demonstrates that Congress was attempting to reach and prohibit every possession of a firearm by a felon; that Congress found that such possession, whether interstate or intrastate, affected interstate commerce; and that Congress did not conclude that intrastate possession was a matter of less concern to it than interstate possession. That finding was unnecessary if Congress also required proof that each receipt or possession of a firearm was in or affected interstate or foreign commerce.

5. Senator Long's explanatory comments reveal clearly the purpose, the intent, and the extent of the legislation:

"I have prepared an amendment which I will offer at an appropriate time, simply setting forth the fact that anybody who has been convicted of a felony . . . is not permitted to *possess* a firearm . . . .

"It might be well to analyze, for a moment, the logic involved. When a man has been convicted of a felony, unless—as this bill sets forth—he has been expressly pardoned by the President and the pardon states that the person is to be permitted to *possess* firearms in the future, that man would have no right

---

[3] "§ 1201. Congressional findings and declaration.

"The Congress hereby finds and declares that the receipt, possession, or transportation of a firearm by felons . . . constitutes—

"(1) a burden on commerce or threat affecting the free flow of commerce . . . ."

to *possess* firearms. He would be punished criminally if he is found in *possession* of them." 114 Cong. Rec. 13868 (emphasis supplied).

"So Congress simply finds that the *possession* of these weapons by the wrong kind of people is either a burden on commerce or a threat that affects the free flow of commerce.

"You cannot do business in an area, and you certainly cannot do as much of it and do it as well as you would like, if in order to do business you have to go through a street where there are burglars, murderers, and arsonists armed to the teeth against innocent citizens. So the threat certainly affects the free flow of commerce." 114 Cong. Rec. 13869 (emphasis supplied).

"What the amendment seeks to do is to make it unlawful for a firearm—be it a handgun, a machine-gun, a long-range rifle, or any kind of firearm—to be in the *possession* of a convicted felon who has not been pardoned and who has therefore lost his right to *possess* firearms. . . . It also relates to the transportation of firearms.

.      .      .      .      .

"Clauses 1–5 describe persons who, by their actions, have demonstrated that they are dangerous, or that they may become dangerous. Stated simply, they may not be trusted to *possess* a firearm without becoming a threat to society. This title would apply both to hand guns and to long guns.

.      .      .      .      .

"All of these murderers had shown violent tendencies before they committed the crime for which they are most infamous. They should not have been permitted to *possess* a gun. Yet, there is no Federal law which would deny *possession* to these undesirables.

"The killer of Medgar Evers, the murderer of the three civil rights workers in Mississippi, the defendants who shot Captain Lemuel Penn (on a highway while he was driving back to Washington after completion of reserve Military duty) would all be free under present Federal law to acquire another gun and repeat those same sorts of crimes in the future.

.    .    .    .    .

"So, under Title VII, every citizen could *possess* a gun until the commission of his first felony. Upon his conviction, however, Title VII would deny every assassin, murderer, thief and burglar of *the right to possess* a firearm in the future except where he has been pardoned by the President or a State Governor and has been expressly authorized by his pardon to possess a firearm.

"It has been said that Congress lacks the power to outlaw *mere possession* of weapons. . . .

". . . The important point is that this legislation demonstrates that *possession* of a deadly weapon by the wrong people can be controlled by Congress, without regard to where the police power resides under the Constitution.

"Without question, the Federal Government does have power to control *possession* of weapons where such *possession* could become a threat to interstate commerce . . . .

"State gun control laws where they exist have proven inadequate to bar *possession* of firearms from those most likely to use them for unlawful purposes. . . .

.    .    .    .    .

"Nor would Title VII impinge upon the rights of citizens generally to *possess* firearms for legitimate and lawful purposes. It deals solely with those

who have demonstrated that they cannot be trusted to *possess* a firearm—those whose prior acts—mostly voluntary—have placed them outside of our society. . . .

.        .        .        .        .

". . . I am convinced that we have enough constitutional power to prohibit these categories of people from *possessing,* receiving, or transporting a firearm. . . .

.        .        .        .        .

"This amendment would provide that a convicted felon who participates in one of these marches and *is carrying a firearm* would be violating the law. . . ." 114 Cong. Rec. 14773–14774 (emphasis supplied).

One cannot detect in these remarks any purpose to restrict or limit the type of possession that was being considered for proscription.

6. The Court's construction of § 1202 (a), limiting its application to interstate possession and receipt, shrinks the statute into something little more than a duplication of 18 U. S. C. §§ 922 (g) and (h). I cannot ascribe to Congress such a gesture of nonaccomplishment.

I thus conclude that § 1202 (a) was intended to and does reach all possessions and receipts of firearms by convicted felons, and that the Court should move on and decide the constitutional issue present in this case.