**UNITED STATES of America**

v.

**Winthrop Drake THIES, Appellant.**

**UNITED STATES of America**

v.

**Lewis MARCUS, Appellant.**

**Nos. 77–1334, 77–1388.**

United States Court of Appeals,
Third Circuit.

Argued Dec. 5, 1977.

Decided Jan. 23, 1978.

Norman A. Olch, New York City, for Winthrop Drake Thies.

Roger A. Lowenstein, Lowenstein, Sandler, Brochin, Kohe & Fisher, Newark, N. J., for Lewis Marcus.

Jonathan L. Goldstein, U. S. Atty., Maryanne T. Desmond, Asst. U. S. Atty., Newark, N. J., for appellee.

Before ALDISERT and WEIS, Circuit Judges, and CHRISTENSEN, District Judge.*

## OPINION OF THE COURT

WEIS, Circuit Judge.

The issue in this appeal is not whether the defendants' reprehensible conduct was a criminal offense, but whether it was a federal crime. To establish jurisdiction, the government was required to establish that the sale of certain worthless bonds constituted interstate commerce. The proof, however, was lacking. We find an unexplained nine-year gap from the time the securities were converted in Arizona or California to their reappearance in the challenged sale is fatal to the prosecution and requires that we vacate the convictions.

Defendants Winthrop Drake Thies and Lewis Marcus were convicted of conspiracy and the substantive offense of selling Pinal County Development Association Industrial Revenue bonds in violation of 18 U.S.C. § 2315. The indictment charged that the securities were moving as, were a part of, and constituted interstate commerce and that the defendants knew the securities had been unlawfully converted. The jury accepted the government's proof and rendered guilty verdicts on the two counts submitted to it. The district court denied post trial motions, and sentenced both defendants to prison terms.

In 1964, the Pinal County Development Association issued coupon bearer bonds in the face amount of eighty-two and one-half million dollars to finance an industrial complex in Pinal County, Arizona, a project which died aborning. Although the bonds were printed, other preliminary steps to sale on the open market were not carried out. Sometime before 1967, a large quantity of the bonds were taken to California by one Haldiman. In 1967, the Superior Court of Arizona for the County of Pinal declared the bond indenture agreement null and void and ordered the return of all bonds for destruction. In all, more than forty-eight million dollars in face value of bonds were returned and destroyed. The remaining bonds, though authentic in appearance, were valueless and the Association was not able to account for them.

During 1974 and 1975, defendant Marcus deposited more than $100,000 face value of coupons from Pinal County Development Association bonds in a number of banks in several states. Accounts were opened in fictitious names with small initial deposits. After the coupons were deposited, large sums of cash were withdrawn and the accounts were closed. In late 1974 or early 1975, Marcus, using the name of Lewis Rubin, followed this procedure in a New York bank. At that time he was living at the Robert Treat Hotel in Newark, New Jersey.

Marcus was arrested in connection with these activities and confined to the Metropolitan Correction Center. There he confided in another inmate that he had negotiated the coupons and had access to substantial quantities of the bonds. Marcus' confidant advised the F.B.I. of defendant's admission, and at the Bureau's request maneuvered to have Marcus sell some of the bonds. At the first step, Marcus was introduced to F.B.I. undercover agent Louis Tosti as a person who was interested in buying Pinal bonds.

Marcus directed Tosti to his "outside" man, defendant Thies, a member of the New York Bar. At their first meeting on April 23, 1976, Thies told Tosti that Marcus had several million dollars of Pinal bonds but that the Association had gone out of business and that the S.E.C. had taken the bonds off the market. After some negotiation, Tosti agreed to buy one million dollars of the bonds for fifty thousand dollars. Because the bonds looked authentic, they could be used as collateral for fraudulent bank loans. Thus; although they were worthless to a legitimate investor, the bonds were not without value to those who would use them to perpetrate a criminal scheme.

---

* Honorable A. Sherman Christensen, of the United States District Court for the District of Utah, sitting by designation.

After Marcus learned that a sale had been agreed upon, he sent several letters. One, addressed to a Steve Vento in New York City, stated that Marcus had directed his friend in New Jersey to give fifteen thousand of the fifty thousand dollars to Vento. A letter to Thies gave further instructions, and included an agreement that he and Marcus would divide twenty-five thousand dollars between them.

In preparation for the purchase, Tosti called Thies who said that he had over a "mil" in Pinal bonds and instructed the agent to take fifty thousand dollars in cash to a Newark bank. On several occasions afterwards, Marcus told Tosti that the transfer had to be delayed, in one instance because Thies was unavailable, and later because a messenger had not yet arrived at the Metropolitan Correction Center. Marcus said he wished to personally instruct the messenger where to deliver the bonds. On May 10, 1976, Tosti and Thies met at the Newark bank. Thies asked Tosti to sign a document which stated he had been told the bonds were not properly issued, were worthless and that he would not use them for illegal purposes. The agent signed the paper and exchanged $50,000 for the bonds. Thies then took the cash to the bank's safe deposit box area and was arrested. Five of the bonds had coupons due in April, 1976 still attached; the remainder had coupons due no earlier than April, 1977.

The defendants raise a number of contentions on appeal,[1] but we discuss only one— the failure of the prosecution to establish the statutory nexus with interstate commerce. In pertinent part, 18 U.S.C. § 2315 reads, "Whoever . . . sells . . . securities . . . with a value of $5,000 or more . . . moving as, or which are a part of, or which constitute interstate . . . commerce . . . knowing the same to have been stolen, unlawfully converted or taken . . . shall be fined . . . ." Defendants contend that the record in this case does not show that the interstate character of the transaction continued through the lengthy time period involved.

Congress has used the commerce clause as a basis for its exercise of criminal jurisdiction in a variety of circumstances. Such proscribed conduct as interstate car theft—the Dyer Act, 18 U.S.C. §§ 2311–2313; kidnapping, 18 U.S.C. § 1201; firearms possession, 18 U.S.C. § 922, 18 U.S.C. App. §§ 1201–1202; theft from interstate shipment, 18 U.S.C. § 659; and the one under scrutiny here, sale of unlawfully converted property and securities, come readily to mind. Jurisdictional language has differed in the various statutes, and consequently the decisional law includes both broad and narrow applications of the interstate nexus. The differences in statutory language in some measure represent congressional recognition that enforcement of the general criminal laws has traditionally been entrusted to the states. The degree to which the federal government should act in that sphere is dependent upon such factors as the nature of the offense, the difficulty of enforcement by a single state, and the national policies affected. In construing the statute, the question is not usually the extent to which Congress *may* exercise its power under the Commerce Clause but, rather, how far it chose to go in a specific instance.

Thus, in *Barrett v. United States*, 423 U.S. 212, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976), the Supreme Court analyzed the manifest purpose of Congress in enacting the Gun

---

1. The defendants also contend that:
   1. there was no proof of an unlawful conversion;
   2. the defendants had no knowledge of events establishing a conversion;
   3. the bonds in question were not "securities";
   4. the face amount was used erroneously to establish the five thousand dollar figure required by the statute;
   5. evidence of Marcus' prior criminal conduct was prejudicial and should not have been admitted;
   6. the admission of a letter from Mahoney to Haldiman was improper;
   7. Thies was denied a fair trial because of bias on the part of the trial judge.

   We have examined these contentions and find them to be without merit.

Control Act of 1968, 18 U.S.C. § 922(h), and found that a broad regulatory function was intended. The Court's opinion contrasted the language used in the Act with that used in others, including the one at issue here, 18 U.S.C. § 2315, commenting: "Statutes other than the Gun Control Act similarly utilize restrictive language when only direct interstate commerce is to be reached, *see, e. g.,* 18 U.S.C. §§ 659, 1084, 1201, 1231, 1951, 1952, 2313, 2315, and 2421, and 15 U.S.C. § 77(e)." 423 U.S. at 217, 96 S.Ct. at 501.

On a more restrictive note, in *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), the Court discussed congressional reluctance to "define as a federal crime conduct readily denounced as criminal by the States" and stated: "[W]e will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal legislation." 404 U.S. at 349, 92 S.Ct. at 523.

The interstate commerce provision of 18 U.S.C. § 2315 has not received extensive judicial interpretation and has proved troublesome when the issue has been raised. In *United States v. Pichany,* 490 F.2d 1073 (7th Cir. 1973), the court noted judicial reluctance to prescribe a time period between theft in one state and possession in another which may establish the interstate commerce requirement. 490 F.2d at 1078. Nevertheless, the court stated: "Such a limit surely must exist." *Id.* This court was confronted with the contention that no interstate commerce was involved where only a brief period elapsed between theft and sale in *United States v. Marcus,* 429 F.2d 654 (3d Cir. 1970). There, we said: "While at some point all articles of commerce may cease to be part of an interstate shipment, all that is required under this and similar statutes is for the act prohibited to be part of a larger plan or scheme by which the goods are moved in an interstate manner." *Id.* at 657. *See also Schwachter v. United States,* 237 F.2d 640 (6th Cir. 1956); *United States v. Briddle,* 430 F.2d 1335 (8th Cir. 1970).

In *United States v. Rocco,* 99 F.Supp. 746 (W.D.Pa.1951), *aff'd,* 193 F.2d 1008 (3d Cir.), *cert. denied,* 343 U.S. 927, 72 S.Ct. 761, 96 L.Ed. 1338 (1952), bonds which had been stolen some four years previously were found to still constitute interstate commerce for purposes of § 2315. In *McNally v. Hill,* 69 F.2d 38 (3d Cir.), *aff'd,* 293 U.S. 131, 55 S.Ct. 24, 79 L.Ed. 238 (1934), in the course of analyzing a predecessor statute with the identical interstate commerce wording, this court said the mere fact that a journey between states had come to an end does not necessarily end the interstate character of the transaction. The stolen article having come to rest may still be so closely related to interstate commerce as to remain a part of it.

■ In summary, case law holds that the jurisdictional basis does not disappear as soon as the interstate trip is concluded, but continues for such a period of time thereafter that the transaction may still "constitute interstate commerce." However, the statutory language does not permit a construction which would allow jurisdiction to be exercised without limit after an article had once been involved in an interstate movement. Section 2315 speaks of "moving as, or which are a part of or which constitute interstate commerce." As the Supreme Court observed in *Barrett v. United States, supra,* Congress chooses tense with an intent to define the application of the statute.

The legislative history is quite sparse but does support a somewhat restrictive view. The predecessor to § 2315 was the National Stolen Property Act of 1934, ch. 333, § 4, 48 Stat. 794, *as amended by* Act of Aug. 3, 1939, ch. 413, § 2, 53 Stat. 1178 (formerly codified at 18 U.S.C. § 416 (1940 ed.)). In passing and amending that Act, Congress made it clear that the statute was not intended to be all-encompassing: "This bill does not go so far as to make larceny, or other offenses which are purely intrastate, interstate in character, subjecting the offenders to Federal jurisdiction." 84 Cong. Rec. 9411 (1939) (Remarks of Senator King). It is also apparent that Congress did not

intend to exercise the full extent of its power to regulate interstate commerce because a $5,000 jurisdictional limit was imposed to prevent the Justice Department from being overburdened with prosecutions under the Act. See H.R.Rep. No. 1462, 73d Cong. 2d Sess. 2 (1934).

Whether the interstate aspects of the transaction are adequate to satisfy § 2315 is generally a question of fact and our interpretation of the statute is necessarily dependent upon the circumstances present here. We must analyze the evidence here to determine if it was sufficient to allow submission of the commerce issue to the jury. According to the testimony, the bonds may have been part of those taken from Arizona as early as 1964 or retained after the court decree in 1967. The first time that they reappeared after those dates was in New Jersey in 1976, a span of between 9 and 13 years. There is no evidence of when the bonds were moved from California or Arizona, when they arrived in New Jersey, or whether they were present in any other state in the interim. The evidence that coupons from the bonds were deposited in banks in several states within a comparatively short time before the sale occurred in New Jersey is not enough. Testimony at the trial established that coupons may be detached from the bonds themselves and there is no necessity to present the bonds at a bank when depositing coupons. Experience would indicate that it would be uncommon for a possessor to carry bulky bonds to a bank when his only purpose was to deposit small-sized coupons. Moreover, legitimate owners of valuable bearer bonds are not likely to carry such securities about unnecessarily. The fact that coupons travelled in interstate commerce, therefore, may not be used to infer that the bonds themselves were similarly transported.

The government also introduced evidence that in April, 1975, the first guest to occupy Marcus' Newark hotel room after he had checked out found an envelope in the room containing three bonds. A label affixed to the envelope showed John Thies of Scars-dale, New York as the addressee, and listed the return address of a New York trade association. The envelope was postmarked in New York on October 31, 1974. In addition to the bonds, it contained a carbon copy of a letter written by the defendant Thies to the Social Security Administration on behalf of a client.

This evidence established nothing relevant other than bonds were in Marcus' New Jersey room and that perhaps Thies had been there. It does not show that the bonds were in the envelope when it was mailed in New York or that the bonds were ever in that state. The evidence furnishes additional proof that Marcus and Thies were associated in their enterprise in New Jersey and bonds were present in that state, but it does not establish interstate commerce.

Even with the benefit of inferences to be drawn from the testimony in favor of the government, nothing more is established than that the bonds were in California or Arizona in 1967 and in New Jersey in 1976. There is simply not enough to show that the bond transaction constituted interstate commerce in 1976. Since the evidence produced at the trial failed to establish that the occurrence is one within the ambit of 18 U.S.C. § 2315, the convictions as to the substantive counts must be vacated.

The conspiracy count must fall as well. Having charged that the conspiracy was to violate Title 18 U.S.C. § 2315 by selling securities constituting interstate commerce, the burden was on the government to prove that fact. Having failed to establish an essential element of the conspiracy, the prosecution cannot sustain the conviction. United States v. Pepe, 512 F.2d 1129, 1132 (3d Cir. 1975); United States v. Galardi, 476 F.2d 1072 (9th Cir.), cert. denied, 414 U.S. 839, 94 S.Ct. 90, 38 L.Ed.2d 75 (1973).

The judgments of the district court will be vacated.