785 F.2d 497
 UNITED STATES of America, Appellee,
v.
John COTOIA, Jr., Appellant.
UNITED STATES of America, Appellee,
v.
Peter J. BAKER, Appellant.
UNITED STATES of America, Appellee,
v.
Alfred "Fred" DeFUSCO, Appellant.
UNITED STATES of America, Appellee,
v.
Norman CARDINALE, Appellant.
UNITED STATES of America, Appellee,
v.
Richard L. DION, Appellant.
UNITED STATES of America, Appellee,
v.
John R. IRONS, Diane M. Scardera (Irons), Appellants.
UNITED STATES of America, Appellee,
v.
James LaCHANCE, Appellant.
UNITED STATES of America, Appellee,
v.
Angelo F. MARSELLA, Appellant.
UNITED STATES of America, Appellee,
v.
Edward G. REGINE, Appellant.
UNITED STATES of America, Appellee,
v.
Ernest PERSICHINO, Appellant.
 Nos. 85-5083 to 85-5092.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 10, 1986.
Decided March 6, 1986.
 
 Anthony M. Traini (Leppo & Traini, Randolph, Mass., on brief), for appellants.
 Douglas Cannon, Asst. U.S. Atty. (Kenneth W. McAllister, U.S. Atty., Greensboro, N.C., Becky M. Strickland, Paralegal Specialist, on brief) for appellee.
 Before MURNAGHAN and WILKINSON, Circuit Judges, and MERHIGE, United States District Judge for the Eastern District of Virginia, sitting by designation.
 MURNAGHAN, Circuit Judge.
 
 
 1
 In the United States District Court for the Middle District of North Carolina six prosecutions which have been consolidated for appeal involved charges of conspiracy and of the substantive offenses of interstate transportation of forged and altered or falsely made securities, namely motor vehicle title certificates. Defendants were Rhode Island wholesale automobile dealers engaged in retitling motor vehicles in North Carolina, in the process of which odometer readings were systematically and substantially reduced.
 
 
 2
 Trial by jury was waived by all defendants and the case proceeded on stipulations. Some convictions and some acquittals resulted. From the convictions, ten defendants have appealed. For one or more of each of them there have been convictions of a) conspiracy to transport in interstate commerce falsely made, forged and altered securities (18 U.S.C. Sec. 371), b) conspiracy to commit mail fraud and to transport in interstate commerce falsely made, forged and altered securities (18 U.S.C. Sec. 371), c) interstate transportation of forged and altered securities (18 U.S.C. Secs. 2314 and 2), and d) interstate transportation of falsely made securities (18 U.S.C. Secs. 2314 and 2).[1]
 
 
 3
 Appellants raise a variety of objections about the propriety of the indictments and of the statute under which they were prosecuted, as well as the sufficiency of the evidence. One thing not contested on appeal, however, is the status of the certificates of title as securities within the meaning of 18 U.S.C. Sec. 2311.
 
 
 4
 In January of 1984, Darrell Hicks, the President of Seville Enterprises, a used car business in North Carolina, met with John Irons of Cranston, Rhode Island, and agreed to "wash" titles for Irons through the motor vehicle administration of the State of North Carolina. The scheme involved the buying of cars in Massachusetts, Rhode Island and New Jersey with high mileage recorded on the odometers as well as on the title certificates. The title certificates were sent to Irons' house, where his girlfriend, subsequently his wife, Diane Scardera, changed the mileage shown on the certificates, and approximately once a week bundled the certificates up and sent them by Federal Express to Hicks. Hicks, upon receiving them, notarized for each the title assignment section with a false notary's seal and sent them to the North Carolina Department of Motor Vehicles. On receipt of the newly issued North Carolina titles with the altered mileage entered on the face, Hicks sent them interstate by Federal Express to Irons' house.
 
 
 5
 The mileage rollbacks on the titles resulted in an average $500 to $1000 increase in value for each car on the wholesale used car market. Irons forwarded the North Carolina titles to the various members of the group, who then resold the cars and reaped substantial inflated profits.
 
 
 6
 Hicks first was paid $50.00 for each title washed under the scheme, and later the payment increased to $75.00 per title.
 
 
 7
 Defendants, Marsella, Regine and Persichino, were Rhode Island members of a car ring. Marsella owned Master Auto Sales, and bought many cars at Rhode Island wholesale auctions. Edward Regine was listed as Marsella's registered buyer at several of the auctions. Evidence connected Persichino as a buyer for Master Auto Sales as well. Persichino owned Eastern Auto Sales, later Greenville Auto Sales. Regine was listed as an authorized representative of Persichino's auto sales enterprise.
 
 
 8
 The three men ran the two businesses much as if they were one. One witness stopped by Eastern Auto Sales to buy a car and Marsella showed him Persichino's inventory. Nothing at Eastern suited the buyer, so Marsella took him to the nearby Master Auto Sales, where Marsella sold him two cars.
 
 
 9
 The records offered by the government established that cars with high mileage were purchased by Regine and Marsella, and that the titles were laundered through the Irons-Hicks connection and eventually returned to Marsella and Regine. The cars were then sold with rolled back odometers, and with the corresponding reduced mileage on the North Carolina titles, to unsuspecting customers.
 
 
 10
 While the cars were not transported interstate, the certificates of title were.
 
 
 11
 The alterations made by Irons and Scardera on the Massachusetts, Rhode Island and New Jersey title certificates could not have uniformly been subtle or well-concealed. The North Carolina DMV refused to issue new titles for one set of New England title documents submitted by Hicks. Hicks sent them north to the Irons/Scardera residence that afternoon and that evening, Hicks was arrested.
 
 
 12
 Dion transported between Rhode Island and North Carolina title certificates to be washed and the newly issued North Carolina certificates of title bearing the falsified odometer readings.
 
 
 13
 The principal argument that appellants offer is that the mileage readings on the title certificates were not "material," that is, had no effect on the validity of the title certificates as a whole. Because the mileage shown, correct or incorrect, is immaterial to the validity of title, defendants have claimed that their alterations of the mileage were not a violation of 18 U.S.C. Sec. 2314, in the same way that forged countersignatures on checks are not "alterations" of the checks themselves. Appellants rely on United States v. Tyson, 690 F.2d 9 (1st Cir.1982), in which the First Circuit held that a valid check passed with a forged countersignature is not an "altered" security within the meaning of Sec. 2314.[2]
 
 
 14
 We are aware of only one case which has specifically addressed the issue of alteration of mileage on certificates of title and its materiality under 18 U.S.C. Sec. 2314. United States v. Rudge, 474 F.Supp. 360 (S.D.Iowa 1979). In Rudge, the defendant was running a title washing operation much the same as the one at issue here. The indictment alleged that the defendant had transported "falsely made" titles (certificates issued by Iowa on the basis of altered certificates from other states). The court held that such title certificates were not "falsely made" within the meaning of the statute. Id. at 362. In passing, however, the court treated the issue of materiality at some length:
 
 
 15
 The certificate is a genuine certificate of title for the motor vehicle. The false information it contains concerning the mileage of the motor vehicle does not impair its genuineness as the certificate of title for the motor vehicle. The certificate will serve its primary legal purposes of proof of ownership of the motor vehicle ... and the means of transferring ownership of the motor vehicle....
 
 
 16
 To hold otherwise would be to add serious legal insult to the injury suffered by a good faith purchaser by depriving him of ownership of the vehicle, thus parlaying the odometer fraud into a title fraud. Such is not the intent of the statute.
 
 
 17
 Id.
 
 
 18
 It may be doubted that the argument deriving from Rudge has great applicability to the original Massachusetts, Rhode Island and New Jersey certificates, which were indubitably altered and transported in interstate commerce prior to their submission to North Carolina for replacement. That consideration would lead to the factoring out of the argument of a number of the indictments. Rudge dealt with the substituted Iowa certificates, not the original ones. As to them, no alteration of the certificates occurred, which is why the prosecution proceeded under the "falsely made" provision of the statute. Yet, it must be realized though that one of the counts charged Dion with "interstate transportation of falsely made securities," thereby tying him to a transaction in which North Carolina certificates were involved.
 
 
 19
 In any event, it does not appear to us to follow that, because a false mileage statement does not invalidate the certificate for purposes of establishing and transferring title, it may not be false for other material purposes. The reliance of the purchaser on the stated mileage makes the deliberate misstatement very material even though the certificate, regardless of the falsity, serves to pass title. There are states, North Carolina in particular, which do make the accuracy of the mileage material to the validity of the title. See N.C.Gen.Stat. Sec. 20-347 (1983) (whenever title is reassigned, odometer reading must be recorded on reverse of title).
 
 
 20
 In a similar situation, false items appearing on the face of the security that are not essential to the actual validity of the security for foal registration purposes have, nevertheless, been found to be material for the purposes of Sec. 2314. In United States v. Bowers, 739 F.2d 1050 (6th Cir.1984), cert. denied sub nom. Oakes v. United States, --- U.S. ----, 105 S.Ct. 195, 83 L.Ed.2d 128 (1984), the scheme was to perpetrate a fraud by substituting good, previously unregistered race horses as ringers for horses with poor records. The court noted that alterations in the record of previous ownership and of the horse's track record were routinely relied upon in purchase and sale. Id. at 1057. Despite the fact that the recorded information might not have been required by state law, nevertheless, the court held that alterations as to pertinent aspects of the nature involved would be material alterations of the security.
 
 The Fifth Circuit has noted that:
 
 21
 The aim of [Sec. 2314] is, of course, to prohibit the use of interstate transportation facilities for goods having certain unlawful qualities. This reflects a congressional purpose to reach all ways by which an owner is wrongfully deprived of the use or benefits of the use of his property.
 
 
 22
 Lyda v. United States, 279 F.2d 461, 464 (5th Cir.1960). If, as the Fifth Circuit has pointed out, the purpose of the statute is to "reach all ways by which an owner is wrongfully deprived of the use or benefits of the use of his property," then surely procuring issuance of a certificate of title falsely stating the odometer reading and thereby substantially affecting the sale value of the vehicle is material. Consequently, despite the holding in United States v. Rudge, supra, we are satisfied that the alteration or false making was material for the purposes of 18 U.S.C. Sec. 2314.
 
 
 23
 A related issue raised is whether the indictment is infirm for charging defendants with action that is not a crime. The indictments charge the defendants with conspiracy involving interstate transportation of "falsely made" certificates[3] (the newly issued North Carolina title certificates containing the false mileage) as well as transportation of "altered" certificates (the Massachusetts, Rhode Island and New Jersey certificates with the reduced mileage entries). United States v. Sparrow, 635 F.2d 794 (10th Cir.1980) (en banc ), rev'g 614 F.2d 229, cert. denied, 450 U.S. 1004, 101 S.Ct. 1717, 68 L.Ed.2d 209 (1981), indeed, held that "falsely made" securities cannot be those validly issued and precisely what they purport to be, with falsity confined to facts underlying the securities and not appearing on the face of the securities themselves. However, there is a distinction of no little importance between an inaccuracy in the implicit representation of regularity of issuance and a directly false statement of a highly relevant fact appearing on the face of the security.
 
 
 24
 In United States v. Jones, 553 F.2d 351 (4th Cir.1977), cert. denied, 431 U.S. 968, 97 S.Ct. 2928, 53 L.Ed.2d 1064 (1977), we considered a scheme in which an insider in a Canadian company's accounting department arranged for checks to be issued by the company computer to Jones, a confederate in Maryland, who deposited the checks and spent the proceeds. Jones was indicted under 18 U.S.C. Secs. 2314 and 2315 for transportation in interstate and foreign commerce of securities known to have been "stolen, converted or taken by fraud" and for selling or receiving the same. The district court dismissed indictments against Jones on the theory that the checks fell into a statutory exclusion, providing that neither Sec. 2314 nor Sec. 2315 would apply to "any falsely made, forged, altered [or] counterfeited ... security ... issued by ... any ... corporation of any foreign country." 18 U.S.C. Secs. 2314, 2315. On appeal, the Fourth Circuit considered whether the documents produced by the computer but containing false information were "forged." In rejecting that contention, the court nevertheless expressly recognized that, while the documents were genuine, they all the same contained a false statement of fact. Id. at 355. The holding in Jones was that forgeries had not been committed but rather that valid checks had been issued under false pretenses. Id. at 356. Because the checks were not excluded by the statutory exception, the court reversed the dismissal of the indictments and permitted the prosecution to proceed.
 
 
 25
 A more recent decision of the Ninth Circuit addresses the phrase "falsely made" more directly:
 
 
 26
 ... the purpose of the term 'falsely made' was to ... prohibit the fraudulent introduction into commerce of falsely made documents regardless of the precise method by which the introducer or his confederates effected their lack of authenticity.... We do not believe Congress intended to exempt clever schemes that induce state participation in the creation of fraudulent documents from the scope of sections 2314 and 2315.
 
 
 27
 See United States v. Daly, 716 F.2d 1499, 1509 (9th Cir.1983). We, too, are satisfied that documents validly issued containing material false information are still "falsely made" for the purposes of 18 U.S.C. Sec. 2314.
 
 
 28
 Next we turn to the contention that 15 U.S.C. Secs. 1981 et seq., specifically dealing with odometer tampering, supersedes 18 U.S.C. Sec. 2314. When two criminal statutes arguably apply to the same conduct, the narrower statute, as a rule, occupies the field. Busic v. United States, 446 U.S. 398, 406, 100 S.Ct. 1747, 1753, 64 L.Ed.2d 381 (1980) ("a more specific statute will be given precedence over a more general one, regardless of their temporal sequence"); Preiser v. Rodriguez, 411 U.S. 475, 489, 93 S.Ct. 1827, 1836, 36 L.Ed.2d 439 (1973). In addition, where there is ambiguity concerning the ambit of a criminal statute, the ambiguity should be resolved in favor of lenity. United States v. Bass, 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971); Busic, supra, 446 U.S. at 406, 100 S.Ct. at 1752.
 
 
 29
 However, sections 1981 et seq. of 15 U.S.C., the Motor Vehicle Information and Cost Savings Act, do not address altered, forged or false mileage statements on title certificates qualifying as securities. Instead, the statute seeks directly to prevent the actual manipulation itself of the odometers on used automobiles.[4] United States v. Studna, 713 F.2d 416, 418 (8th Cir.1983) ("In enacting the odometer requirement section of the Act Congress sought to prohibit tampering with odometers ..."). There are provisions, it is true, in the statute calling for disclosure of the cumulative mileage upon the transfer of the vehicle. See 15 U.S.C. Sec. 1988. However, the written disclosure required follows a format significantly different from vehicle certificates of title. The cumulative mileage registered on the odometer is to be provided to the transferee, unless the actual mileage is unknown, in which case disclosure of that fact is required. The written disclosure required in no way suggests that it must meet the qualifications necessary to warrant description as a security.
 
 
 30
 Moreover, the Motor Vehicle Information and Cost Savings Act was passed "to provide additional enforcement powers to halt the trafficking of vehicles in interstate commerce which have been subject to odometer rollbacks." United States v. Studna, supra, 713 F.2d at 418 (emphasis supplied).
 
 
 31
 Accordingly, we have concluded that 18 U.S.C. Sec. 2314 remains in full force, in no way rendered by 15 U.S.C. Secs. 1981 et seq. inapplicable to forged or altered or falsely made certificates of title for motor vehicles.
 
 
 32
 Finally, we turn to arguments contesting the sufficiency of the evidence to convict made by Marsella, Regine and Persichino. The appellants argue that, given the dates of acquisition of the cars and the dates of issuance of the new titles in North Carolina, several of the certificates alleged to have been transported separately could have been transported together in one group. The careful documentation of the purchase of the cars and the movement of the documentation through the "laundry machine" indicate clearly that the titles were sent to North Carolina in separate batches. Darrell Hicks' testimony established that Irons and Scardera sent down batches of titles each week, and that Hicks returned the laundered certificates at the end of the week in which he received them back from the North Carolina DMV. There was fully adequate evidence to establish that the certificates in question were sent on separate occasions.
 
 
 33
 Appellants further argue that the evidence may constitute some proof of their aiding and abetting each other, but not of aiding and abetting Irons. Irons, however, made the first contact with Hicks, and personally transported the first fourteen title certificates to North Carolina. Thereafter, all of the weekly batches were mailed to and from Irons' house, and Hicks, as a rule, dealt with Diane Scardera (now Diane Irons) on the telephone if there were problems. The entire operation was set up by Irons and, seemingly, run by Irons and his confederate. The documentary evidence shows that several of the cars, the titles for which were laundered through Irons and Hicks, were purchased by appellants and eventually sold with the new North Carolina titles. The record clearly connects Marsella, Persichino, and Regine as dealers and Irons as launderer.
 
 
 34
 Persichino's efforts to escape on insufficiency of evidence grounds are also doomed to failure. He was identified by several witnesses as a business partner of Regine and Marsella. There was adequate evidence establishing that Persichino was familiar with the existence of one car, the title for which was laundered--and that he was willing to lie about the mileage on the phone.
 
 
 35
 In all respects, the convictions should be affirmed.
 
 
 36
 AFFIRMED.
 
 
 
 [1]
 Since the factual circumstances for the defendants, Ernest Persichino, Angelo F. Marsella and Edward G. Regine are, from their points of view, no less favorable than they are for any of the other defendants, evidentiary considerations are brought out only with respect to the three of them. Legal contentions, where pertinent, however, are made for each and every defendant
 
 
 [2]
 In pertinent part, section 2314 of 18 U.S.C. reads as follows:
 Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited; ....
 ....
 Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.
 
 
 [3]
 As we have earlier noted, in Dion's case there also was a substantive charge of interstate transportation of falsely made certificates
 
 
 [4]
 Title 15, Sec. 1981 of the United States Code reads in pertinent part:
 It is therefore the purpose of this title to prohibit tampering with odometers on motor vehicles and to establish certain safeguards for the protection of purchasers with respect to the sale of motor vehicles having altered or reset odometers.