**UNITED STATES of America**

v.

**Tonya DAVIS, Defendant.**

**Crim. No. 90–0381–LFO.**

United States District Court,
District of Columbia.

April 24, 1991.

Stephanie G. Miller, J. Jiyoung Bang, Asst. U.S. Attys., Washington, D.C., for U.S.

Daniel E. Ellenbogen, Washington, D.C., for defendant.

MEMORANDUM

OBERDORFER, District Judge.

Defendant Davis was arrested on August 13, 1990 on charges of distributing and possessing with intent to distribute a mixture or substance containing cocaine base. Although she was initially detained without bail, Magistrate Judge Attridge ordered her released from detention on the condition that she "return to custody for specified hours following release for employment, schooling, or other purposes." 18 U.S.C. § 3142(c)(1)(B) (xiii) (1988). Accordingly, on August 20, 1990, the District of Columbia Department of Corrections assigned Davis to the Washington HalfWay House for Women. Although she eventually pled guilty to the distribution count and was sentenced on January 25, 1991 to one year in a community confinement facility, Davis remained at the halfway house until April 23, 1991.

At issue now is the amount of credit against her sentence Davis should receive for time spent at the halfway house. Davis contends that her entire stay at the halfway house should be credited. The Bureau of Prison, however, plans to credit her only for the approximately three months spent at the halfway house after sentencing.

Currently before the Court are defendant's motions to correct and stay execu-

tion of her sentence. Between the two motions and the pleadings submitted in connection with them, the sentence credit issue has been adequately briefed. Accordingly, for reasons to be stated in a memorandum to be filed, an Order of April 20, 1991 credited Davis with the time she has spent at the Washington HalfWay House and denied the motion to stay as moot. This is that memorandum.

## I.

The Washington HalfWay House for Women "houses female offenders serving sentences and awaiting trial in the Superior Court and District Courts in Washington, D.C." Affidavit of Loretta Caldwell ¶ 1 (Defendant's Motion to Stay, Appendix at 5). Offenders serving sentences currently remain at the halfway house until the Bureau of Prisons directs them to report to a different facility. *See id.* The halfway house is, however, "awaiting approval from the Department of Justice, Bureau of Prisons, to provide community care facilities for female offenders sentenced in the United States District Court for the District of Columbia on a permanent full-time basis." *Id.* For offenders, like Davis, with a minimum term of imprisonment of ten months or less in their guideline range, "a sentence of probation ... that substitute[s] ... community confinement ... for imprisonment" may be imposed. *See* United States Sentencing Commission, *Guidelines Manual,* § 5C1.1(c) (Nov. 1990). Prisoners serving longer sentences may also be assigned to halfway houses near the completion of their terms. *See* 18 U.S.C. § 3624(c).

As a resident of the Washington Half-Way House for Women, Davis was confined to the premises from 6:00 p.m. each night until 6:00 a.m. the next morning. *See* Affidavit of Tonya Davis ¶ 2 (Defendant's Motion to Stay, Appendix at 2). At first, she was only permitted to leave the halfway house to travel to work; later she was given a limited number of passes to travel to other destinations. *See id.* Davis was never, however, able to travel anywhere she pleased. She could only leave the halfway house for previously authorized destinations, and, if she failed to abide by these limits, she was subject to loss of privileges or, if the unauthorized absence was greater than two hours, prosecution for escape with a criminal sanction of up to five years imprisonment. *See* Orientation Package at 6–8 (Defendant's Motion to Stay, Appendix at 10).

The halfway house rules also limited Davis' freedom while inside the halfway house. Like all residents, she was required to provide urine specimens each week. *See id.* at 4; Davis Affidavit ¶ 3. The halfway house rules also prohibited the use of alcohol, sexual activities, entering the rooms of other residents, meeting with guests on the front or back property of the house, or talking on the telephone for more than fifteen minutes at one time. *See* Orientation Package at 8, 10; Memorandum from Teresa Davis to All Residents, May 19, 1988 at 1 (Defendant's Motion to Stay, Appendix at 21). Finally, under the halfway house rules, staff members could search Davis' property or her person upon request. *See id.* at 6.

## II.

Before considering whether all the time that Davis spent subject to these restrictions should be credited against her sentence or only the time after sentencing, one preliminary matter must be considered. The Bureau of Prisons has a formal procedure for resolving inmate grievances. *See* 28 C.F.R. § 542 (1990). Normally, Davis would be required to exhaust that process and give the Bureau of Prisons a chance to reconsider its decision before her claims could be heard in federal court. However, because the requirement of administrative exhaustion is not jurisdictional, it can be waived by the Government. *See, e.g., Brown v. Rison,* 895 F.2d 533, 535 (9th Cir.1990); *United States v. Woods,* 888 F.2d 653, 654 (10th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1301, 108 L.Ed.2d 478 (1990). In this case, the Government has not challenged Davis' claim for failure to exhaust her administrative remedies. Accordingly, any potential objections must be deemed waived. *See Brown v. Rison,*

895 F.2d at 535; *United States v. Woods,* 888 F.2d at 654.

## III.

Under the Comprehensive Crime Control Act of 1984, a term of imprisonment commences "on the date the defendant is received in custody awaiting transportation to ... the official detention facility at which the sentence is to be served." 18 U.S.C. § 3585(a).[1] Davis asserts, and the Government has not disputed, that under this provision her term of imprisonment began on January 25, 1991 when she was confined to the halfway house after her sentence was imposed. They disagree, however, on whether she should receive "credit toward the service of a term of imprisonment" for time spent in the halfway house before sentencing. *Id.* § 3585(b).[2] Specifically, they dispute whether the time spent at the halfway house before sentencing was spent "in official detention." *See id.*

"To a normal English speaker, even to a legal English speaker, being forced to live in halfway house is·to be held 'in custody.'" *Ramsey v. Brennan,* 878 F.2d 995, 996 (7th Cir.1989). The pretrial detention rules seem to recognize this as well: They require defendants on work release to return "to *custody* for specified hours following release." 18 U.S.C. § 3142(c)(1)(B)(xiii) (emphasis added). Indeed, by apparently agreeing to grant Davis credit for the time spent at the halfway house after sentencing, the Bureau of Prisons implicitly determined that Davis was "in custody" there. *See* 18 U.S.C. § 3585(a). Because detention is "a holding in custody," *Webster's Third New International Dictionary* 616 (1971), the plain language of the statute strongly suggests the conclusion that the Bureau of Prisons must treat Davis' time spent in the halfway house before sentencing as time spent "in official detention" and credit it toward the service of her term of imprisonment.

Although the "ordinary and obvious meaning of [a] phrase is not to be lightly discounted," *INS v. Cardoza–Fonseca,* 480 U.S. 421, 431, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1986), at times the context in which statutory language is used suggests a more limited and technical meaning. This is not one of them. The conditions of confinement to which Davis was subjected at the Washington HalfWay House for Women were "simply too close to incarceration to permit a distinction for purposes of credit against [her] sentence." *Brown v. Rison,* 895 F.2d at 536. Davis was "physically incarcerated there for a substantial part of each day." *Id.* at 536. During her period of release, she was not at liberty to go wherever she pleased. Instead, she had to receive prior authorization for any destination, and if she did not, she was subject to discipline, possibly prosecution, and perhaps imprisonment. Inside the halfway house, her liberty was also restricted: She was prohibited from engaging in entirely legal activities such as using alcohol or enjoying sexual intimacy, and her contact with others, whether by telephone or in person, was restricted. She was required to take regular drug tests. Indeed, Davis was subject to searches of her person and property upon request by any member of the halfway house staff. In short, she was not merely subject to a curfew as a condition of release into the community pending trial. She was subject to pervasive supervision by the halfway house as well as

---

1. 18 U.S.C. § 3585(a) provides in full:

   **Commencement of sentence**—A sentence to a term of imprisonment commences on the date the defendant is received in custody awaiting transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served.

2. That section provides in full:

   **Credit for prior custody**—A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences—

   (1) as a result of the offense for which the sentence was imposed; or

   (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;

   that has not been credited against another sentence.

restrictions upon her liberty twenty-four hours a day.

As a functional matter, this level of control is more like full-time incarceration than unlike it. Although Davis was not placed in a cell in a facility surrounded by guard towers and a fence, neither are prisoners who are assigned to minimum security facilities. *See* American Correctional Association, *Standards for Adult Correctional Institutions* §§ 2–4131, 2–4177 (2d ed. 1981). The fact that she was not physically incarcerated twenty-four hours a day does not materially distinguish her situation either: Some prisoners are also allowed to leave their "place of imprisonment" on work release. *See* 18 U.S.C. § 3622(c); *see generally* American Bar Association, *Standards for Criminal Justice: Chapter 23—Legal Status of Prisoners* § 23–4.2, at 18 (Fourth Tentative Draft 1982) (noting that a majority of jurisdictions have work release programs "for prisoners in appropriate security classifications"). In fact, the level of control at the Washington Half-Way House for Women is sufficiently high that it is being considered to house federal prisoners. *See supra* 2.

The Government nonetheless contends that "official detention" should be interpreted only to cover full-time incarceration pending trial or sentencing. Specifically, it argues that "official detention" under 18 U.S.C. § 3585(b) should be read in conjunction with the pretrial detention rules in 18 U.S.C. § 3142. These rules define residence in a halfway house as a condition of release and apparently limit the word "detention" to twenty-four-hour-a-day incarceration. *See* 18 U.S.C. § 3142(c)(1)(B)(xiii). This argument has some initial appeal because both sections 3585(b) and 3142 were enacted as part of the Comprehensive Crime Control Act of 1984. *See* Pub.L. 98–473, Title II, § 203(a), Oct. 12, 1984, 98 Stat. 1976 (codified at 18 U.S.C. § 3142); Pub.L. 98–473, Title II, § 212(a)(2), Oct. 12, 1984, 98 Stat. 2001 (codified at 18 U.S.C. § 3585). There is, however, no evidence that Congress meant to use section 3142's technical definition of detention in section 3585(b). Indeed, a close reading of the Act suggests just the opposite. In addition to revising pretrial detention rules and the rules for the calculating sentence credits, the Comprehensive Crime Control Act of 1984 also promulgated new rules for work release, and in authorizing prisoners to "work at paid employment in the community," Congress stipulated that they must continue in *"official detention* at [a] penal or correctional facility" while on work release. Pub.L. 98–473, Title II, § 212(a)(2), Oct. 12, 1984, 98 Stat. 2007 (codified at 18 U.S.C. § 3622(c)) (emphasis added). Thus, in connection with work release Congress did not equate "official detention" with twenty-four-hour-a-day incarceration but rather used the phrase according to its ordinary meaning, and there is no reason to think that Congress used the same phrase in any more technical or restrictive fashion in section 3585(b).

In the alternative, the Government argues that (a) section 3585(b) was not intended to change the previous rules for sentence credit, (b) before the Comprehensive Crime Control Act of 1984 was passed those rules were interpreted to preclude credit for all forms of pretrial release including release to halfway houses, and therefore (c) Congress did not intend to extend credit under the new section for confinement to a halfway house. The Government's major premise is correct: In enacting section 3585, Congress did not intend to change the rules for awarding sentence credits. *See* S.Rep. No. 225, 98th Cong., 2d Sess. 128–29, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3311–12; *United States v. Woods*, 888 F.2d at 654–55. The minor premise is, however, false. In the first place, the previous statute awarded credit for time spent "in custody." *See* Act of June 25, 1948, c. 645, 62 Stat. 683, 838. By the terms of the release order as well as the Bureau's apparent determination that Davis' sentence commenced immediately after sentencing, Davis was in the custody of the halfway house. *See supra* 5–6. Thus, logic, as well as the language of the prior statute, suggests that Davis should be awarded credit for the time spent in the halfway house before sentencing.

The previous case law does not suggest that Congress had a different intention. None of the cases cited by the Government which were decided before the Comprehensive Crime Control Act of 1984 was passed considered work release or halfway house confinement. Those cases addressed more traditional restrictions upon persons staying in their homes: obeying laws and court orders, reporting to the probation officer, turning in passports, remaining within the jurisdiction, and avoiding contact with alleged victims and potential witnesses. *See Cerrella v. Hanberry,* 650 F.2d 606, 607 (5th Cir.), *cert. denied* 454 U.S. 1034, 102 S.Ct. 573, 70 L.Ed.2d 478 (1981); *United States v. Robles,* 563 F.2d 1308 (9th Cir. 1977) (per curiam), *cert. denied,* 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978); *Polakoff v. United States,* 489 F.2d 727, 730 (5th Cir.1974); *Ortega v. United States,* 510 F.2d 412 (10th Cir.1975) (per curiam). Indeed, our court of appeals, in announcing the generally recognized principle behind these rulings, stated a rationale entirely consistent with awarding Davis credit for the time she was confined in the Washington HalfWay House for Women. It refused to grant sentence credit for individuals out on bail, albeit subject to some restrictive conditions, because " 'in custody,' as used in the statute, means detention or imprisonment in a place of confinement and does not refer to the stipulations imposed when a defendant is at large on conditional release." *United States v. Peterson,* 507 F.2d 1191, 1192 (D.C.Cir.1974) (per curiam). Because Davis was not "at large" but rather at a "place of confinement" when she resided at the Washington HalfWay House for Women, granting her credit would be entirely consistent with the case law against which Congress revised the sentence credit provision. As a consequence, the Government has provided no evidence that Congress meant anything other than what it said or in any way intended to preclude sentence credit for time spent in a halfway house on work release.

The Government also contends that the weight of more recent precedent is against awarding credit for time spent in community confinement. As a matter of sheer numbers, the Government is correct. Three circuits have refused to grant credit for time spent in a halfway house under either section 3585(b) or its predecessor. *See United States v. Woods,* 888 F.2d 653 (10th Cir.1989); *Ramsey v. Brennan,* 878 F.2d 995 (7th Cir.1989); *United States v. Smith,* 869 F.2d 835 (5th Cir.1989). The question is, however, far from settled. The Ninth Circuit has recently found that time spent in the custody of a halfway house warrants sentence credit, *see Brown v. Rison,* 895 F.2d 533 (9th Cir.1990), and an earlier Eleventh Circuit decision found that the Bureau of Prisons' failure to grant such credit violated the guarantee of the equal protection of the laws as applicable to the federal government through the due process clause of the Fifth Amendment. *See Johnson v. Smith,* 696 F.2d 1334 (11th Cir.1983). Moreover, the reasoning behind the cases cited by the Government is far from compelling. In the first place, none of those cases considered that under section 3142 persons confined to halfway houses must "return to *custody*" each day, 18 U.S.C. § 3142(c)(1)(B)(xiii) (emphasis added), or that prisoners on federal work release are nevertheless in "official detention." 18 U.S.C. § 3622(c). Nor did those cases have before them the Bureau of Prisons' apparent determination that the defendant was "in custody" for the purposes of commencement of the sentence under section 3585(b). Furthermore, the Fifth and Tenth Circuits also apparently faced halfway houses with less restrictive conditions of confinement. The Fifth Circuit found that the defendant before it "was required to undergo urinalysis twice a week, call his probation officer once a week, and remain in the Northern District of Texas," conditions "no more stringent that those of his bond or probation." *United States v. Smith,* 869 F.2d at 837. The Tenth Circuit found that the defendant before it was subject to conditions that "were in no way equal to the restrictions placed on a person physically confined in a jail or similar institution." *United States v. Woods,* 888 F.2d at 655. By contrast, Davis was not only incarcerated for half of each day; she was

subject to the control of the halfway house twenty-four hours a day and subject to prosecution for escape if she were absent without authorization for more than two hours. Moreover, her liberty within the halfway house was restricted, and she was subject to searches upon request. These conditions are so restrictive and so similar to those imposed upon a large class of prisoners that the Washington HalfWay House for Women is being considered by the Department of Justice to house prisoners on work release who must "continu[e] in official detention." 18 U.S.C. § 3622(c).

In *Ramsey v. Brennan,* the Seventh Circuit acknowledged that some individuals serving sentences are confined under the same conditions as those confined pending trial or sentencing. It reasoned, however, that prisoners transferred to halfway houses are "not given credit for time served in the same sense" as prisoners in more traditional prisons. *Ramsey v. Brennan,* 878 F.2d at 997. According to the Seventh Circuit, such prisoners "are merely beneficiaries of the Attorney General's discretionary authority to 'designate as a place of confinement any available, suitable, and appropriate institution or facility,' 18 U.S.C. § 4082(b) (since repealed)...." *Ramsey v. Brennan,* 878 F.2d at 996. Whatever validity this argument may have had in relation to pre–Guideline prisoners, it is no longer available because the Attorney General no longer has the discretion to assign a prisoner to any facility he deems appropriate. Under the Comprehensive Crime Control Act of 1984, convicted criminals must now be "committed to the *custody* of the Bureau of Prisons until the expiration of the term imposed." 18 U.S.C. § 3621(a) (emphasis added). Unless one assumes that the Bureau of Prisons is wantonly violating this clear congressional instruction to keep prisoners in its custody through the term of their sentence, the prisoners assigned to community confinement facilities like the Washington Half-Way House for Women must be "in custody of the Bureau of Prisons," and those awaiting trial under identical restrictions must likewise be considered to be in custody.

The Seventh Circuit also argued that the word custody is "a chameleon." *Ramsey v. Brennan,* 878 F.2d at 996. In the Seventh Circuit's opinion,

> whether the deprivation of liberty by confinement in a halfway house is sufficiently like prison to be treated the same in deciding how long the convicted criminal should serve [ ] is not a question susceptible of rational determination, at least by tools of inquiry available to judges. It is a matter of judgement, or policy, or discretion.

*Id.* Finding the Bureau of Prisons' determination that confinement in a halfway house was not sufficiently analogous to prison to warrant sentence credit to be reasonable, the Seventh Circuit deferred to the Bureau. *See id.* By contrast, the Ninth Circuit, while acknowledging the ambiguity in the word custody, nevertheless found that the word had a core meaning and that the conditions of confinement at a halfway house clearly fell into that core. *See Brown v. Rison,* 895 F.2d at 536. More fundamentally, the Seventh Circuit did not look to other provisions and reason by analogy, a characteristic "tool[ ] of inquiry available to judges." As a consequence, it failed to recognize that the condition of some prisoners in the custody of the Bureau of Prisons is nearly, if not actually, identical to the conditions of Davis' confinement in the Washington HalfWay House for Women. *See supra* 640–641.

Finally, even if there were some ambiguity in the term "official detention," the Bureau of Prison's interpretation of it would be unreasonable. Even where Congress has not "directly spoken to the precise question at issue," the agency's interpretation must nevertheless be "based upon a permissible construction." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). To be permissible, a particular interpretation must be not only based upon the words of the statute considered in isolation, but also upon the "traditional tools of statutory interpretation." *Id.* at 843 n. 9, 104 S.Ct. at 27 n. 9. One of those tools

is the canon of construction that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems." *DeBartolo v. Florida Gulf Coast Bldg. & Constr.*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988) (citing *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1976)); *but cf. Michigan Citizens for an Independent Press v. Thornburgh*, 868 F.2d 1285, 1292 (D.C.Cir.1989) (admonishing courts to not "pick[ ] and choose[ ] among the various canons of construction"). Here, the Bureau of Prisons' interpretation creates rather than avoids a serious constitutional problem. The evident purpose of 18 U.S.C. § 3585 is to ensure that "those incarcerated for federal offenses receive credit against their sentences for time spent in custody in connection with the offense or acts for which sentence was imposed." *Johnson v. Smith*, 696 F.2d at 1337 (quotation and quotation marks omitted). As a consequence, persons like Davis who are confined while awaiting trial and sentencing are similarly situated to those confined after sentencing who are subject to the same conditions of confinement and to similar prosecution for escaping. The Government argues that it places prisoners into the custody of halfway houses because doing so helps prisoners to reintegrate into society. Although this policy is laudable and certainly more than adequately justifies placing some prisoners in work release, it does not explain why those awaiting assignment at a halfway house after sentencing receive credit, nor does it explain why a distinction should be drawn between those confined to a halfway house before sentencing and all others in the halfway houses for purposes of calculating sentence credits. Thus, the Bureau of Prisons' interpretation of the statute raises a serious constitutional problem, which according to the Supreme Court's decision in *DeBartolo*, it is unreasonable to assume that Congress intended to do without an express congressional instruction.

The Bureau of Prisons' interpretation also violates another well-settled canon of statutory interpretation: the rule of lenity. Our court of appeals recently recognized the "venerable position that the rule occupies in Anglo–American jurisprudence." *United States v. Nofziger*, 878 F.2d 442, 452 (D.C.Cir.), *cert. denied* —— U.S. ——, 110 S.Ct. 564, 107 L.Ed.2d 559 (1989). Under this well-settled principle, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971) (citation omitted). Here, the Bureau of Prisons has not only failed to interpret ambiguity in favor of lenity; it has adopted a harsh interpretation in the face of the natural and obvious interpretation of the statutory language. In light of the rule of lenity, that interpretation is unreasonable.

To summarize, the conditions of confinement at the halfway house fall under the ordinary and obvious meaning of "official detention." Moreover, those conditions are analogous, and may soon be identical, to the conditions under which many convicted criminals in the custody of the Bureau of Prisons are confined yet receive sentence credit. Despite these facts and despite the Bureau's apparent determination that Davis was in custody for the purposes of section 3585(a), the Bureau of Prisons nevertheless interprets section 3585(b) against Davis and towards a serious equal protection problem. Even given the considerable deference due the Bureau of Prisons as the agency charged with administering section 3585, *see, e.g., Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), such an interpretation must be rejected as an unreasonable and impermissible construction of the statute. Accordingly, the Order of April 22, 1991 granted defendant's motion to correct sentence, and an accompanying order will instruct the Bureau of Prisons to credit the time in which Davis was confined to the Washington HalfWay House for Women against her sentence.

### IV.

Because of this determination, it was not necessary to consider defendant's motion to

stay execution of her sentence pending the consideration of her motion to correct, and that motion was denied as moot.